**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-617 (DLF)** |
| **PHILIP S. YOUNG** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Philip S. Young to 40 months incarceration, 3 years supervised release, $2,000 restitution**,** and mandatory assessment of $295. The government's recommendation is at the mid-range of Young's guidelines imprisonment range of 37-46 months.

I.      **INTRODUCTION**

Young participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. This figure supersedes the $1.4 million figure referenced in the Statement of Offense.

Young, while standing on the stairs of the Capitol Building leading to the Upper West Terrace, joined others in attacking a police line after someone in the crowd shouted "one, two, three, go!" He, along with several other rioters, lifted and pushed a metal bicycle rack barricade into a wall of officers. Approximately 30 minutes later, he attacked another line of officers in the same location. This time, the crowd was larger. After a rioter was told by law enforcement to get back and that individual was pepper sprayed. In response, Young joined a throng of people that moved forward pushing the barricades. Young and others backed up only after being pepper sprayed by police. But Young was not finished. He made his way to the east side of the Capitol, and in an effort to sabotage law enforcement, let the air out of the tire of a government vehicle. Young has never expressed remorse for his conduct that day.

The government recommends that the Court sentence Young to 40 months of incarceration, the mid-range of the U.S.S.G. range for his conviction of violating 18 U.S.C. § 111(a)(1), assaulting, resisting, or impeding certain officers. A 40-month sentence reflects the gravity of Young's conduct, his lack of remorse, and the need for deterrence.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021, Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 26, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

**B.      Philip S. Young's Role in the January 6, 2021, Attack on the Capitol**

Young drove to Washington D.C., from his home in New Jersey, the morning of January 6, 2021. He drove with a friend of his and they got to Washington around 10:00 a.m. or 10:30. According to the interview he gave to the FBI after his arrest in this matter, they went to hear President Trump's speech at the Washington Monument. When the speech was over, they went to the Capitol as it was on the way to their car.

At approximately 2:35 pm., Young walked up the steps towards the Upper West Terrace of the Capitol and stopped to take pictures. (See Figure 1 below).



Figure 1

Young stood on a portion of the Upper West Terrace below a set of steps. At the top of the

steps, a line of Metropolitan Police Department ("MPD") officers stood behind a line of metal bike racks serving as a barricade. Young remained below the barricades as other rioters arrived and the crowd grew larger. At one point, Young spoke to officers defending the Capitol, but his words were indiscernable. (See Figure 2 below).



Figure 2

As the crowd continued to grow, Young grew agitated, extending his hand and saying "24, 25, 30, I don't fucking get it," as if to question the number of law enforcement officers present.

(See Figure 3 below).



Figure 3

At approximately 2:46 p.m., another rioter yelled "one, two, three go!" As a group, the rioters, including Young, pushed forward. Young rushed up the stairs and grabbed the barricade. Young, along with several other rioters, lifted the barricade off the ground and pushed it into MPD officers K.T. and J.R. (See Figures 4 and 5 below).

5



Figure 4



Figure 5

As some officers absorbed the force of the barricade, others reacted by using pepper-spray against the rioters, forcing Young and the other rioters back down the steps. Young remained in the area, visibly angry, and agitatedly asking the officers "Really? Really? Fucking A!". At approximately 2:50 p.m., Young again aggressively spoke to the officers, though the audio of the body worn camera did not pick up what is said. Despite the efforts of Young and others, law enforcement was able to replace the barricades and maintain the security line.

By around 3:12 p.m., the crowd size had grown appreciably around Young. At approximately 3:19 p.m., the rioters were told by law enforcement to get back. One of the rioters who refused the command was pepper sprayed. Angered by the police efforts to control the crowd, Young joined the throng of rioters and pushed the barricade forward for a second time. The crowd was sprayed again, and Young and the others backed up. (See Figure 6 below). Law enforcement was ultimately able to hold the rioters back and the attempted breach was unsuccessful.



Figure 6

Eventually, Young left the Upper West Terrace, and made his way to the east front of the Capitol. At approximately 3:54 p.m., Young approached the tires of a government vehicle parked on the grounds of the Capitol Building and let the air out of one of the tires. (See Figure 7 below).



Figure 7

Young remained in the area for at least another 20 minutes, and was captured on video at approximately 4:13 p.m. on the steps of the east side of the Capitol. (See Figure 8 below).



Figure 8

***Injuries***

Although Officer K.T. and J.R., the assault victims in this case, reported that they did not suffer any physical injuries, Young's participation in this riot aided those rioters who did succeed in injuring officers and destroying property. *See* Section II(A) ("Injuries and Property Damage Caused by the January 6, 2021 Attack") *supra.* His violent conduct served to incite and embolden other violent rioters around him.

***Young's Post-Arrest Interview with the FBI***

Young was arrested at his home on August 19, 2021. Young admitted driving to Washington, D.C. the morning of January 6, 2021, with a friend. He claimed that after the rally was over and the crowd went to the Capitol, he went along because his car was in that direction.

He was shown a still photo of the confrontation from after someone yelled "one, two, three go," and asked what happened during that encounter. Young claimed he was "disgusted by the

10

whole thing. Why can't we just go up there?" He said an officer told him to get back down. Young said he was going to go back around and the officer told him to go back the way he came from. Young said he then laughed at the officer and went back down. The agents questioned Young about him not being at the barricades when the pushing and shouting started, that he was down a few steps. Young said he followed as he wanted to get up to the veranda as he hadn't been there since grade school.

Young falsely denied that he was angry when he was at the Capitol, claiming that he didn't know what was going through his mind that day and saying, "It's like being at work when shit happens. You can't remember all the details. You just get caught up." Young also tried to blame his conduct on simply being part of the crowd, saying, "It got ugly, and they all went up. The crowd went up and then I went up." Although there was a riot going on around him, of which he became a part, he told the agents he liked the architecture of the Capitol.

Young was then shown a picture of him and his friend standing by the building, and he reiterated what a beautiful building it is. When confronted with evidence that he had let the air out of the tire of a federal vehicle, Young did not deny it, but claimed it was a "third-grade prank" and minimized his conduct by saying he "didn't flatten it, I mean I didn't knife it." Young claimed that he had a "giddy feeling" when he let the air out of the tire.

Young claimed that the 2020 election had been "rigged," but denied that his goal was to overturn the election, claiming that he was merely hoping the certification would be "reviewed." He claimed his purpose in going to the rally on January 6 was for a last "joy ride."

When advised of the charges against him, Young said he didn't feel like he had assaulted

11

a police officer, claiming, "I don't even think you can call it [what he did] violent. It was aggressive at best." Young later admitted, "I always had the feeling this was coming. I didn't think I was out of control. I was mad." Young also recalled the cops kept retreating. He was thinking "why are you doing that?" People kept coming and the cops kept stepping back.

Young then asked one of the agents if he was being charged with assault on a federal officer. He was told he was. He also recalled grabbing the barricade and then made a gesture with his outstretched arms and demonstrated his conducted to the interviewing agent. (See Figure 9 below).



Figure 9

## III.    THE CHARGES AND PLEA AGREEMENT

On October 6, 2021, a federal grand jury returned an indictment charging Young with seven counts, including, 18 U.S.C. § 111(a)(1), assaulting, resisting, or impeding certain officers (Count One); 18 U.S.C. § 231(a)(3), civil disorder (Count Two); 18 U.S.C. § 1752(a)(1), entering and remaining in a restricted building or grounds (Count Three); 18 U.S.C. § 1752(a)(2), disorderly and disruptive conduct in a restricted building or grounds (Count Four); 18 U.S.C. § 1752(a)(4), engaging in physical violence in a restricted building or grounds (Count Five); 40 U.S.C. § 5104(e)(2)(D), disorderly conduct in a Capitol Building or grounds (Count Six); and 40 U.S.C. § 5104(e)(2)(F), act of physical violence in the Capitol grounds or buildings (Count Seven). On November 2, 2022, Young pleaded guilty to all seven offenses. There is no plea agreement in this matter.

## IV.    STATUTORY PENALTIES

Young now faces sentencing on each of the charges set forth above. As noted by the Presentence Report issued by the U.S. Probation Office, Young faces a maximum term of imprisonment of eight years on Count One, five years on Count Two, not more than one year on Counts Three, Four and Five, and not more than six months on Counts Six and Seven.

Young faces terms of supervised release of not more than three years on Counts One and Two, and not more than one year on Counts Three, Four and Five. He faces fines not to exceed $250,000 on Counts One and Two; $100,000 on Counts Three, Four and Five; and $5,000 on Counts Six and Seven. The special assessments are $100 on Counts One and Two, $25 on Counts Three, Four and Five, and $10 on Counts Six and Seven.

## V. THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." United States v. Gall, 552 U.S. 38, 49 (2007).

The PSR does not include a Guidelines analysis for each of the seven counts of conviction. Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The PSR does not follow these steps. The government submits the proper Guideline analysis follows:

**Count One, Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1)**

| Base Offense Level | 10 | U.S.S.G. § 2A2.4 |
|---|---|---|
| Cross-Reference | | U.S.S.G. §2A2.4(c) – if the conduct constituted aggravated assault, apply §2A2.2<br><br>"Aggravated Assault" means a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (*i.e.*, not merely to frighten), with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony.<br><br>Here, (D) is applicable, as Young committed the assault with the intent to commit the felony offense charged in Count Two. |

14

| | | |
|---|---|---|
| Base Offense Level: | 14 | U.S.S.G. §2A2.2 |
| Specific offense characteristics | +4 | U.S.S.G. §2A2.2(b)(2)(B) Dangerous weapon was used<br><br>"Dangerous weapon" means (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of causing death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (e.g.,   a defendant wrapped a hand in a towel during a bank robbery the create the impression of a gun.   U.S.S.G. §1B1.1 Application Note 1(E).<br><br>Young's assault was conducted using a large, heavy metal barricade resembling a bike rack. This object was capable of causing death or serious injury. |
| Adjustment | +6 | USSG §3A1.2: Official Victim<br><br>(a) If (1) the victim was (A) a government officer or employee; (B) a former government officer or employee; or (C) a member of the immediate family of a person described in subdivision (A) or (B); and (2) the offense of conviction was motivated by such status, increase by 3 levels<br>(b) If subsection (a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person), increase by 6 levels<br><br>Victims J.R. and K.T. were MPD officers at the time of the assault, and Young's assault was motivated by their position as police officers. |
| | | |
| Total Offense Level | 24 | |

**Count Two: Interfering with Law Enforcement During a Civil Disorder, 18 U.S.C. § 231(a)(3)**

Since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, use "the most analogous guideline."  U.S.S.G. §2X5.1.  Here, that is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers."

| Base Offense Level: | 10 | U.S.S.G. §2A2.4 |
|---|---|---|
| Adjustment | +3 | U.S.S.G. § 2A2.4(b)(1)(A) – if the offense involved physical contact, increase by 3 levels |
|  |  |  |
| Total Offense Level | 13 |  |

**Count Three, Entering or Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1)**

| Base Offense Level: | 4 | U.S.S.G. §2B2.3(a) |
|---|---|---|
| Special offense characteristic | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds."  On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
|  |  |  |
| Total Offense Level | 6 |  |

**Count Four, Disorderly or Disruptive Conduct in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(2)**

| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
|---|---|---|
| Specific offense characteristic | +3 | U.S.S.G. §2A2.4(b): if the offense "involved physical contact" Young pushed the metal barricade directly into MPD officers, resulting in physical contact |
|  |  |  |
| Total Offense Level | 13 |  |

**Count Five, Engaging in Physical Violence in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(4)**

| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
|---|---|---|
| Specific offense characteristic | +3 | U.S.S.G. §2A2.4(b): if the offense "involved physical contact" |

16

| | | |
|---|---|---|
| | | Young pushed the metal barricade directly into MPD officers, resulting in physical contact |
| | | |
| Total Offense Level | 13 | |

**Count Six, Engaging in Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D); and Count Seven, Act of Physical Violence in the Capitol Grounds or Building, 40 U.S.C. §5104(e)(2)(F)**

| Base Offense Level: | n/a | Because these offenses are Class B misdemeanors, the Guidelines do not apply to them.  *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9. |
|---|---|---|

### ***Grouping Analysis***

Under U.S.S.G. §3D1.2(a) and (c), "closely related counts" group.  The counts of conviction should be placed into three groups:

Group One consists of Count One because it involves victims J.R. and K.T. The offense level for Group One is 24.

Group Two consists of Count Two because the victim of the offense is the police. The offense level for Group Two is 13.

Group Three consists of Counts Three, Four and Five because the victim of these offenses is Congress. The offense level for Group Three is 13.

Pursuant to U.S.S.G. § 3D1.4, one unit is counted for Group One, and no units are counted for Groups Two and Three. There is thus no increase in offense level and the combined offense level is 24.

***Acceptance of Responsibility***

The PSR correctly recommends a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1 (PSR ¶ 42). The government also intends to move for an additional one-level reduction pursuant to U.S.S.G. § 3E1.1(b).

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 46. Based on the government's calculation of the defendant's total adjusted offense level of 21 after acceptance of responsibility, Young's Guidelines imprisonment range is 37-46 months of imprisonment.

The government anticipates Young will dispute that his conduct constitutes an aggravated assault and that U.S.S.G. § 2A2.2 therefore applies. For the reasons set forth below, Young is incorrect.

Young entered a guilty plea to an indictment charging him in Count One with violating 18 U.S.C. § 111(a)(1) for assaulting, resisting, or impeding certain officers or employees. The guidelines analysis for a violation of § 111(a)(1) begins in U.S.S.G. § 2A2.4.  Section 2A2.4(c) provides a cross-reference to §2A2.2, which applies "[i]f the conduct constituted aggravated assault."  As used in Section 2A2.4(c), "conduct" refers to all relevant conduct for the offense, not simply the assault for which Young was convicted.  *See United States v. Valdez-Torres*, 108 F.3d 385, 387–88 (D.C. Cir. 1997).  Section 2A2.2, in turn, defines "aggravated assault" as a "felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or

attempting to strangle or suffocate; or (D) an intent to commit another felony." U.S.S.G. §2A2.2 cmt. n.1.

The cross-reference in §2A2.4(c) applies here because Young's assault was an aggravated assault. The Guidelines do not define "assault" or "felonious assault," and sentencing courts have looked to the common law to define "assault" for Guidelines purposes. *See United States v. Hampton*, 628 F.3d 654, 660 (4th Cir. 2010). Assault encompasses conduct intended to injure another or presenting a realistic threat of violence to another. *See United States v. Dat Quoc Do*, 994 F.3d 1096, 1099 (9th Cir. 2021) (federal common-law assault includes (1) "a willful attempt to inflict injury upon the person of another," or (2) "a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.") (citations omitted); *Lucas v. United States*, 443 F. Supp. 539, 543-44 (D.D.C. 1977) (individual assaulted police officer, in violation of 18 U.S.C. § 111, where he "forcibly grabbed" the officer; § 111 "includes the lifting of a menacing hand toward the officer, or shoving him"), *aff'd*, 590 F.2d 356 (D.C. Cir. 1979). Here, Young assaulted MPD officers by lifting up a heavy metal barricade and pushing it directly into the officers.   That conduct reflected a "willful attempt to inflict injury upon" the officers.

The assault charged in the information is a "felonious assault" under 18 U.S.C. § 111 for two reasons. First, it involved physical contact. *See* 18 U.S.C. § 111(a) (mandating imprisonment of up to eight years where assault involves physical contact with the victim of that assault). Second, it involved "an intent to commit another felony" because the assault occurred during and in furtherance of the commission of another felony offense, namely, 18 U.S.C. § 231(a)(3)

19

(Obstructing, Impeding, or Interfering with a Law Enforcement Officer During a Civil Disorder). *See* 18 U.S.C. § 111(a) (mandating imprisonment of up to eight years where the assault involves the intent to commit another felony). Here, the defendant obstructed and interfered with law enforcement officers by pushing a metal barricade directly into the officers in the midst of an ongoing civil disorder.

The "felonious assault" here qualified as an "aggravated assault" as defined in U.S.S.G. §2A2.2 cmt. n.1. As noted above, an aggravated assault in the Guidelines is a "felonious assault" that involved . . . an intent to commit another felony." *Id.* Here, the felonious assault in 18 U.S.C. § 111(a) involved the intent to commit the civil disorder felony violation (18 U.S.C. § 231(a)(3)), as described in the preceding paragraph. Moreover, because Section 231(a) is a specific-intent crime, *see United States v. McHugh*, No. 21-cr-453, 2022 WL 296304, at *14 (D.D.C. Feb. 1, 2022), the intent-to-commit-another-felony basis for finding an aggravated assault exists even under a more restrictive approach that would apply the aggravated-assault definition in U.S.S.G. §2A2.2's commentary only "if a defendant commits another felony that has a specific intent mens rea or if the defendant specifically intended to committee the other felony—*i.e.*, the purposes of the assault was to commit another felony," *United States v. Rodella*, No. 14-cr-2783, 2015 WL 711941, at *31 (D.N.M. Feb. 5, 2015). It is not required that the defendant be charged with or convicted of a violation Section 231(a)(3). *See United States v. Thompson*, 60 F.3d 514, 518 (8th Cir. 1995) (upholding finding that defendant committed aggravated assault where defendant was convicted under Section 111 and his conduct involved the intent to commit state-law robbery, where the state-law robbery charge was later dismissed); *United States v. Rue*, 988 F.2d 94, 97(10th Cir.

1993) (upholding finding that defendant committed aggravated assault where defendant was convicted under Section 111 and his conduct involved the intent to commit possession of a syringe and a controlled substance, where the defendant was charged with but not convicted of the latter offenses); *United States v. Robles*, 557 F. App'x 355, 359 (5th Cir. 2014) (upholding finding that defendant committed aggravated assault where defendant was convicted under Section 111 and his conduct involved the intent to commit the uncharged state-law felony of evading arrest while using a vehicle); *United States v. Ranaldson*, 386 F. App'x 419, 429 (4th Cir. 2010) (upholding finding that defendant committed aggravated assault where defendant was convicted under Section 111 and his conduct involved the intent to commit the uncharged state-law felony of intentionally attempting to disarm a law enforcement officer).   Other judges on this Court have applied the cross-reference in §2A2.4(c) in analogous circumstances.   *See United States v. Leffingwell*, 21-cr-5 (ABJ), ECF No. 53 at 12-24.[2]

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Young's felonious conduct on January 6,

---

[2]   This Court has also applied the §2A2.4(c) cross-reference in the following cases where application of the cross-reference was not disputed:  *United States v. Duke Wilson,* 21-cr-345 (RCL); *United States v. Devlyn Thompson*, 21-cr-461 (RCL); *United States v. Robert Palmer*, 21-cr-328 (TSC); *United States v. Languerand*, 21-cr-353 (JDB); *United States v. Fairlamb*, 21-cr-120 (RCL); *United States v. Creek*, 21-cr-645 (DLF).

2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The nature and circumstances of Young's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 40 months.

### B.   The History and Characteristics of the Defendant

As set forth in the PSR, Young does not have any criminal history. The PSR also did not identify any mental, emotional, physical, or other conditions that would mitigate Young's actions on January 6. There was no evidence of substance abuse issues or impairment, and in his post-arrest interview, Young said he was not "out of control" on January 6, just "mad." His other responses were cognitively appropriate and consistent with an individual consciously trying to minimize his conduct. The absence of any mitigating factors means Young was a conscious, reasoned man who willingly participated in lifting and pushing a bicycle rack barrier, assaulting officers, and chose to be disruptive and disorderly.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Young's criminal conduct of assaulting officers with a bicycle rack barrier, despite being told by officers to get down from the steps, going up a second time to confront the officers, letting the air out of a known government vehicle, admitting his conduct was aggressive but denying it was violent, is the epitome of disrespect for the law.

### D.   The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### Specific Deterrence

The need for the sentence to provide specific deterrence in this case also weighs heavily in favor of a lengthy term of incarceration in light of Young's casual disregard for his conduct: minimizing his conduct by calling it aggressive, not violent, and calling it a third-grade prank.   At the same time, Young has never expressed any remorse for his conduct or his participation in the riot. While Young was willing to agree that the police were backing up from him and the other rioters, he was unwilling to admit that the reason they were backing up was because thousands of people like Mr. Young, who was mad, were forcing their way towards the Capitol, overwhelming the law enforcement officers trying to defend the Capitol.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying

---

[3]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although the defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.   While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Kevin Creek*, 21-cr-645 (DLF), the defendant was part of a mob of rioters who broke through a line of police officers by pushing a bike rack barrier into the officers. Creek ran through the crowd, grabbing an MPD officer and driving him backward forcefully several feet through the West Plaza. After letting go of the officer, Creek hit him in the face shield of his helmet. Creek then made a beeline for a U.S. Capitol Police officer who was attempting to protect himself behind a bike rack barrier and a police shield, gave the officer a hard shove in the shoulders, and then kicked him, causing the officer to fall backward to the ground. Finally, Creek picked up what looked like a ratchet strap – a thick strap with heavy metal buckles-from the ground and threw it in the direction of officers. Creek pled guilty to a single-count information charging him with a violation of 18 U.S.C. § 111(a)(1). The defendant's guidelines range was 24 to 30 months of imprisonment. This court sentenced him to 27 months.

In *United States v. Howard Richardson*, 21-cr-721 (CKK), Richardson saw people heading toward the U.S. Capitol building in large numbers, and he decided to join them. He stormed the police line on the West Terrace just in front of the media tower that had been constructed ahead of

the Presidential Inauguration. He then moved toward the police line with a flagpole raised high in the air and began using the metal pole to strike one of the officers three times. Then, moments later, he helped a group of rioters force a very large metal billboard into the same line of besieged officers, although he was pepper sprayed at least two times. In interviews with officers and in court, he struggled to acknowledge his contributions to the violent attack and the impact his actions had on the law enforcement officers that day. Richardson pled guilty to violating 18 U.S.C. § 111(a)(1). The government recommended a sentence of 46 months. He was sentenced to 46 months imprisonment and 100 hours of community service.

In *United States v. Landon Copeland*, 21-cr-570 (APM), the defendant was present in the West Plaza shortly after rioters overran police lines at the Peace Circle and forced officers to retreat. Copeland made his way to the front of the lines. He pushed another rioter into U.S. Capitol Police Officer T.R. Then, over the course of about one to two minutes, he grappled and fought with other officers who came to Officer T.R.'s aid. Copeland and other rioters engaged in a tug-of-war with the officers over a barricade. When officers deployed chemical spray to subdue Copeland and other rioters, he turned the barricade into a weapon, charging at officers with it and tossing it at them. As part of his plea, Copeland admitted the bike rack barricade was used as a weapon against police by pushing or throwing it at them.   Sentencing is set for January 31, 2023. The government is recommending a sentence of 52 months.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

authority to order restitution to victims of most federal crimes."10 United States v. Papagno, 639

F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the

loss caused by the offense of conviction," Hughey v. United States, 495 U.S. 411, 418 (1990),

identify a specific victim who is "directly and proximately harmed as a result of" the offense of

conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with

recovering from bodily injury, 18 U.S.C. § 3663(b).

Most of the January 6 defendants have been ordered to pay $2,000 in restitution based on

plea agreements. While there is no agreement here as to restitution, the government submits that

an appropriate restitution amount is $2,000. That figure reflects the role Young played in the riot

on January 6. Payment should be made to the Clerk of the Court, who will forward the payment to

the Architect of the Capitol.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a

sentence of 40 months of incarceration, 3 years supervise release, $2,000 restitution, and

mandatory assessment of $295.00.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 48105


By:       /s/ *Susan T. Lehr*
            SUSAN T. LEHR
            Assistant United States Attorney
            NE Bar No. 19248
            District of Columbia Capitol Riot Detailee
            1620 Dodge St, #1400
            Omaha, NE   68102
            Telephone: 402-661-3715
            Email: susan.lehr@usdoj.gov